1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LINK: 29, 31**

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| APRIL CABANA, | )     **Case No. ED CV 13-1741 GAF (DTBx)** |
|         Plaintiff, | ) |
| | ) |
|         v. | )     **MEMORANDUM & ORDER** |
| | )     **REGARDING BENCH TRIAL** |
| RELIANCE STANDARD LIFE | ) |
| INSURANCE COMPANY; ARMOR | ) |
| HOLDINGS, INC. GROUP | ) |
| EMPLOYEE BENEFIT PLAN; and | ) |
| DOES 1 through 10, inclusive, | ) |
| | ) |
|         Defendants. | ) |

**I.**

**INTRODUCTION**

In July 2006, Plaintiff April Cabana ("Plaintiff" or "Cabana") was involved in a traffic accident. She suffered a number of injuries, causing severe pain in her lumbar and cervical spine, shoulders, and right knee. Though she returned to work for a time, Cabana eventually applied for and received long term disability ("LTD") benefits based on these injuries.

This case stems from the subsequent termination of LTD benefits by Defendant Reliance Standard Life Insurance Company ("Reliance"), which administered Cabana's benefits plan. Following a fruitless administrative appeal of the termination, Cabana

1  filed this action, including a claim under the Employee Retirement Income Security Act

2  of 1974 ("ERISA").  She contends that Reliance wrongfully terminated her LTD

3  payments, and seeks reinstatement of those benefits and payment of back benefits.

4  (Docket No. 30 [Pl. Opening Trial Br. ("Pl. Br.")].)  Reliance believes that it acted

5  properly, and that Cabana is no longer "totally disabled" within the meaning of the LTD

6  plan.  (Docket No. 31-1 [Def. Opening Trial Br. ("Def. Br.")].)

7       The matter came for trial on the administrative record on August 26, 2014.  The

8  Parties agreed that the Court should evaluate the plan administrator's disability findings

9  under a de novo standard of review.  Having considered the evidence in the

10 administrative record, the briefing of the Parties, and the arguments presented at trial,

11 the Court finds for Cabana.

## II.

## BACKGROUND

14      Plaintiff began working as a "sales and marketing coordinator" for a company

15 called SafariLand in June 2005.  (Document Lodged 7/29/2013 [Administrative Record

16 ("AR")] at 446–448.)  In essence, she sold car parts to dealerships, helped schedule

17 production of parts, and dealt directly with customers.  (Id. at 1330.)  SafariLand, in

18 turn, provided Cabana with a group disability insurance policy, issued by Defendant as

19 policy number LTD 115844 (the "Plan").  (See id. at 1.)

20      On July 31, 2006, Plaintiff was injured in a traffic accident, leading to a series

21 of medical treatments.  (Id. at 1331.)  These injuries—and Plaintiff's dispute with

22 Defendant over their extent—form the basis of the present action.

23 / / /

24 / / /

## A. PLAINTIFF'S MEDICAL HISTORY

In August 2006, following the accident at issue here,[1] Cabana sought treatment from Dr. Scott Goldman, an orthopedist.  (Id. at 3042.)  He scheduled her for an MRI and prescribed an anti-inflammatory medicine.  (Id.)  The MRI revealed several pertinent spinal injuries:  (1) at Cabana's L5-S1 disc, (id. at 511); (2) at Cabana's C5-6 disc, (id. at 3051); and (3) at Cabana's C3-4 disc, (id. at 3051).  Dr. Goldman suggested physical therapy, but settled on in-home exercises and continued anti-inflammatories when Cabana indicated that therapy would be too expensive.  (Id. at 3056.)

It soon became apparent that this initial treatment would be insufficient.  In November 2006, Cabana saw Dr. Wayne Cheng, another orthopedist.  (Id. at 2073.)  He reviewed the prior MRIs and concluded that Cabana had "severe disk degeneration," with "a lot of motion artifacts."  (Id. at 2074.)  Dr. Cheng referred Cabana to Dr. James Rho for "a cervical spine epidural injection."  (Id. at 1992.)  Dr. Rho began treating Cabana in January 2007, and eventually injected steroids into Cabana's spine.  (Id. at 2379.)

By May 2007, Cabana needed help managing her various pain medications.  (Id. at 1678–1685.)  She therefore began working with a nurse practitioner, Annette Hollenbeck, under the supervision of Dr. Samuel Silao.  (Id. at 1338.)  N.P. Hollenbeck has continued to assist Cabana through the present day, (id. at 1678–1685), and will make several further appearances in the description of Cabana's treatment regimen.

In February 2008, Dr. Silao referred Cabana to Dr. Marc Lynch for further pain management; he in turn referred her to Dr. Ali Mesiwala, a neurosurgeon, to see if she was an appropriate candidate for surgical intervention.  (Id. at 506, 1563–1564.)

---

[1]

In 2001, long before the accident that gave rise to this suit, Cabana was involved in a separate traffic accident that injured her spine.  (AR at 502.)  Though this caused intermittent pain in her lower back, she continued working.  (Id.)  No Party has argued that this 2001 accident gave rise to Cabana's current claim or injuries.

1    Dr. Mesiwala examined Cabana in March 2008.  (Id. at 506.)  He suggested that
2    she undergo a discectomy and fusion, and referred her to Dr. John Cho for a
3    discogram—which would determine if the pain in her lower back was being generated
4    by a specific disc at L5-S1.  (Id. at 507.)  Dr. Cho confirmed that L5-S1 was causing the
5    lower back pain.  (Id. at 500.)

6    Cabana then returned to Dr. Mesiwala, and he performed a discectomy in April
7    2008.  (Id. at 645.)  The C5-6 disc, and various bone fragments pressing on her spine,
8    were removed.  (Id. at 645–646.)  Dr. Mesiwala then fused Cabana's C5 and C6
9    vertebrae together.  (Id.)  A second surgery was performed in September 2008—after
10   she had had time to recover from the first procedure—on Cabana's L5-S1 disc.  (Id. at
11   638–641.)  Again, a discectomy and vertebrae fusion were performed.  (Id.)

12   The discectomies and fusions initially appeared successful.  An x-ray showed
13   "preservation of lumbar vertebral body heights and alignment," and "[n]o evidence of
14   acute fracture or traumatic misalignment."  (Id. at 717.)  Cabana told Dr. Mesiwala in
15   October 2008 that she was still experiencing pain, but he reassured her that it would
16   dissipate with time.  (Id. at 682.)

17   A radiologist, Dr. Saba El Yousef, likewise reviewed the x-rays, and determined
18   that the surgeries had been successful.  (Id. at 712.)  However, Cabana continued to
19   experience pain throughout her back.  Dr. Mesiwala eventually referred her to Dr.
20   Bryan Lee for a pain medication consultation in February 2009.  (Id. at 578.)

21   Dr. Lee described Cabana's pain as very severe, in spite of the apparently
22   successful surgery.  (Id. at 578.)  He gave her epidural steroid injections in both March
23   2009 and April 2009.  (Id. at 760, 762.)  These provided only temporary relief, and
24   Cabana was referred for a CT scan to assess whether the fusion surgeries had been
25   successful.  (Id. at 592.)

26   Dr. Mesiwala apparently reviewed the CT scan and determined that "significant
27   compression" had occurred; further surgery would be necessary.  (Id. at 772.)  Not only

28

1    had the fusion failed, but bony fragments had migrated to new positions, pressing upon

2    Cabana's spine.  (Id. at 1080–1081.)

3         Cabana went under the knife a third time in July 2009.  (Id. at 726.)  Dr.

4    Mesiwala discovered that bone graft material had compressed "the S1 nerve root," and

5    it was scraped away with a surgical instrument.  (Id. at 727.)  Dr. Mesiwala would later

6    testify that it was possible for either scraping or initial compression to cause permanent

7    nerve damages.  (Id. at 1087.)  With her spine opened up, Dr. Mesiwala was also able to

8    determine that fusion had never properly occurred.  (Id. at 727.)  Accordingly, he made

9    another attempt to stabilize Cabana's L5-S1 area.  (Id. at 728.)

10        Even so, Cabana's pain persisted.  She reported continuing back pain, and pain

11   radiating throughout her right leg, in November 2009.  (Id. at 771.)  Cabana returned to

12   Dr. Lee—the pain specialist—who gave her two more epidural steroid injections.  (Id.

13   at 756, 758.)  This did little good, and in February 2010 Cabana continued to report

14   substantial pain.  According to physician's assistant John DeVere, who had assisted Dr.

15   Mesiwala in Cabana's most recent surgery, this pain forced her to "splint[] her weight

16   with her arm while sitting," and to walk "with an antalgic gait."  (Id. at 770.)  That is,

17   with shortened steps characteristic of an effort to reduce pain.

18        As Defendant notes, by November 2010 Cabana had begun rejecting certain

19   pain treatment and surgery options, though she continued filling prescriptions she

20   already had.  (Def. Br. at 12; AR at 810.)  In early 2011, several x-rays were taken

21   which showed no abnormalities in Cabana's spine.  (AR at 2892, 2886–2887.)[2]

22   **B. PLAINTIFF'S INITIAL LTD APPLICATION**

23        Cabana had continued working for a short time after her accident, but shortly

24   after she began seeing N.P. Hollenbeck she sought an "intermittent leave of absence"

25   from SafariLand.  (Id. at 1374–1375.)  This request was granted in July 2007.  (Id.)

26

27   [2]    The Court notes, however, that x-rays are not necessarily dispositive.  In this case, for instance, x-rays
28   showed that Cabana's vertebra had fused after her first two surgeries.  (See, e.g., AR at 712.)  A
     subsequent surgery revealed otherwise.  (Id. at 727.)

1  Cabana's last full day of work was December 17, 2007—prior to any of her surgeries.

2  (Id. at 1375.)

3      Beginning December 18, 2007, Plaintiff was on an approved leave of absence.

4  (Id. at 1376.)  She submitted a claim to Defendant Reliance for LTD benefits in July

5  2008, based on the pain caused by her spinal injuries.  (Id. at 442.)

6      Reliance interviewed Cabana about her injuries and restrictions in October

7  2008.  (Id. at 217.)  A Reliance nurse determined that Cabana's medical conditions

8  rendered her "totally disabled" within the meaning of the Plan, and her LTD claim was

9  approved by the end of the month.  (Id. at 207–208, 324.)

10  **C. CHANGING LTD DEFINITIONS**

11      The Plan under which Plaintiff began receiving LTD benefits in October 2008

12  only covers instances of total disability.  (Id. at 13.)  And "total disability" has one

13  definition for the first 24 months after a claim has been made, but another definition

14  after that 24 months has elapsed.  The Plan provides, in pertinent part:

15          "Totally Disabled" and "Total Disability" mean, that as a result of

16          an Injury or Sickness:

17          (1) during the Elimination Period and for the first 24 months for

18          which a Monthly Benefit is payable, an Insured cannot perform the

19          substantial and material duties of his/her *Regular Occupation* . . .

20          (2) after a Monthly Benefit has been paid for 24 months, an Insured

21          cannot perform the material duties of *any occupation*.   Any

22          occupation is one that the Insured's education, training or

23          experience will reasonably allow.  We consider the Insured Totally

24          Disabled if due to an Injury or Sickness he or she is capable of only

25          performing the material duties on a part-time basis or part of the

26          material duties on a Full-time basis.

27  (Id.) (emphasis added.)

28  / / /

6

1

**D. REEVALUATION AT 24 MONTHS**

2       Defendant's initial determination that Cabana was totally disabled simply

3  reflected the fact that she could not perform her regular occupation.  (Id.)  After 24

4  months, her LTD claim was reviewed to determine whether she could perform "the

5  material duties of any occupation."  (Id. at 382.)  On April 28, 2010, Reliance

6  completed their investigation into this issue and determined that, even under the broader

7  definition, Cabana was "totally disabled."  (Id.)

8       Nevertheless, Reliance engaged in ongoing evaluations of Cabana's medical

9  record.  In February 2011, Nurse Mary Kay Walder—who had been reviewing these

10  records—said that "[l]ack of consistent work function is supported ongoing through

11  10/1/11."  (Id. at 212–213.)  This review also reflected notes that Reliance should obtain

12  further medical records.  (Id. at 213.)  Nurse Walder then changed her mind about

13  Cabana's disability level in November 2011.  (Id. at 214.)  "In review of updated

14  [primary care physician] records, it appears reasonable to support sedentary restrictions

15  and limitations . . . ."  (Id.)  In other words, Defendant cleared Cabana to return to

16  sedentary, full-time work.  (Compare id. at 13.)

17       Though the Court has combed the evidence before it, and questioned counsel

18  about these "updated records" during the trial, it is unclear what Nurse Walder actually

19  relied upon when she made this determination.  Defendant's counsel suggested that the

20  changes in Plaintiff's condition were reflected in Nurse Walder's notes from February

21  and November 2011; these indicate that she stopped taking three medications during

22  that time, one of which was a prescription painkiller.  (Id. at 213, 214.)  On the other

23  hand, Plaintiff's actual pharmacy records show that she continued filling multiple

24  prescriptions for different painkillers throughout this period.  (Id. at 3559–3560,

25  3405–3457.)  The "primary care physician records" upon which Nurse Walder's

26  evaluation were purportedly based are not in evidence.

27       No further description of Plaintiff's ostensibly changed circumstances was

28  provided, but her continuing LTD claim was denied on December 1, 2011.  (Id. at 413.)

**E. PLAINTIFF'S APPEALS**

Following the denial of LTD benefits, Cabana initiated an appeals process. (See, e.g., id. at 862, 897.)  Throughout this process, she provided a series of reports.

Dr. David Patterson, an expert in rehabilitative medicine, indicated that Cabana had severe nerve damage, leading to poor bladder control.  (Id. at 898.)  She had episodes of blacking out and, in his opinion, was "not fit for gainful employment and [had] reached maximum medical improvement."  (Id. at 900.)

A neurologist, Dr. Lew Disney, submitted a similar report.  He wrote that she was unable to sit still, had an antalgic gait, and continually squirmed due to ongoing lumbar pain.  (Id. at 885.)  Moreover, her prior disc fusions were not solid, and additional bone growth had taken place in other areas of her spine.  (Id. at 887.)

N.P. Hollenbeck, who had been managing Cabana's pain medication and treatment for several years, concurred.  (Id. at 902.)  Cabana could not "even drive for any length of time without being in chronic pain," and she was "constantly shifting and trying to reposition herself to minimize her pain."  (Id.)  Both Cabana and her boyfriend submitted declarations stating, in effect, that her pain was so great that she "can't do anything or go anywhere."  (Id. at 873, 876.)  Around January 2012, Cabana also obtained a new series of CT scans.  These showed an entirely new disc bulge at L4-5. (Id. at 902, 1264.)

Reliance responded by scheduling Cabana for an examination with Dr. Robertus Kounang, who is board certified in physical medicine and rehabilitation.  (Id. at 948.) The Parties dispute whether Dr. Kounang was actually independent, (see Pl. Br. at 16–17; Def. Br. at 13), but the text of his report is relatively straightforward.

In August 2012, Dr. Kounang determined that Cabana's fusion was solid, and that there were "no objective findings" to substantiate her claimed pain.  (AR at 982.) However, he did observe that Cabana "walks on her toes with hesitation and walks on her heels with back pain."  (Id. at 966.)  Moreover, as Cabana notes, Dr. Kounang's initial "solid fusion" diagnosis was made without reference to any x-rays or CT scans.

(Id. at 1312) (describing receipt of scans after the original report had been completed.) Instead, he simply reviewed the prior medical reports described above.  (Id. at 971–980.)

The scans, though, would have been largely irrelevant to Dr. Kounang's initial evaluation; he has apparently not been trained in "reading radiographic images."  (See Pl. Br. at 17.)  When he eventually received the scans in April 2013, he required assistance from a radiologist to open and interpret them.  (AR at 1312.)  With this help, Dr. Kounang prepared a one page addendum stating simply that they suggested proper fusion and did "not change [his] opinion as indicated" in the August 2012 report.  (Id.)  The Court notes that scans following Cabana's first round of surgeries had also suggested proper fusion, but a subsequent surgery conclusively revealed a failure to fuse.  (See Pl. Br. at 25.)  Moreover, Dr. Mesiwala—who performed all of Plaintiff's surgeries—specifically stated that it was not possible to determine whether fusion had occurred without a CT scan taken around the time of the surgeries.  (AR at 1088.)  No such CT scan was ever taken.   (Id. at 1088.)

Nevertheless, in response to Dr. Kounang's report, a new rehabilitation expert was consulted—Mr. Allessandro Anfuso—who remarked upon Cabana's difficulty sitting and constant discomfort.  (Id. at 1410.)  He determined that this constant pain substantially impaired her ability to work without distraction, based on her performance on a series of vocational tests.  (Id. at 1333, 1410.)

**F. NEGATIVE SOCIAL SECURITY DETERMINATION**

Finally, the Court notes that Cabana submitted a claim for disability benefits to the Social Security Administration ("SSA") in early 2010, prior to Defendant's termination of benefits.  (Id. at 791.)  This claim was denied in March 2010 because Plaintiff was found to be "not disabled."  (Id.)  As Cabana points out, this was based on an initial review with no hearing, no evidence, no administrative law judge, and only a limited number of medical records.  (Id. at 791–796.)  No appeal was taken—perhaps because she was still receiving benefits from Reliance when the denial came through,

1    and any award would have been treated simply as an offset.  Moreover, notwithstanding

2    SSA's finding, Reliance subsequently confirmed Plaintiff's benefits.  (Id. at 212–213.)

3                                      **III.**

4                                **DISCUSSION**

5    **A.  ERISA Standard of Review**

6           When Congress enacted ERISA, it did so to protect the "interests of participants

7    in employee benefit plans and their beneficiaries."  29 U.S.C. § 1001(b).  To this end,

8    ERISA requires employers and plan administrators to provide participants with certain

9    information about their benefits plans.  It also permits a participant to file a civil action

10   in federal court to challenge a denial of benefits under a benefits plan.  29 U.S.C.

11   1132(a)(1)(B); Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008).  When

12   presiding over such a cause of action, and reviewing a plan administrator's decision to

13   deny benefits to a participant, a district court applies one of two standards of review:  it

14   either reviews the decision de novo, or for an abuse of discretion.  The default standard

15   of review is de novo.  See Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115

16   (1989).  A court reviews for abuse of discretion where the plan itself provides for it or

17   otherwise grants the administrator discretionary authority to determine a participant's

18   eligibility for benefits.  Metro. Life Ins., 554 U.S. at 111.  Here, the parties agree that

19   the proper standard of review is de novo. (Def. Trial Br. 13; Pl. Resp. Br. 1.)

20          Accordingly, the Court must review the administrative record, without

21   deference,  to determine whether Defendant correctly terminated Plaintiff's LTD

22   benefits.  Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006).

23   **B.  APPLICATION**

24          Because the standard of review is de novo, Plaintiff bears the burden of proving

25   entitlement to benefits.  Muniz v. Amec Constr. Mgmt. Inc., 623 F.3d 1290, 1294 (9th

26   Cir. 2010).  Accordingly, she has provided substantial documentation of her injuries,

27   including reports from at least five medical health professionals filed during her

28   administrative appeal.  Each of these reports suggests "total disability."  Defendant's

counter-argument, by contrast, depends almost entirely upon Dr. Kounang's less-than-persuasive review of the record.

The Court must conclude, under these circumstances, that Plaintiff has satisfied her burden.

### 1. QUALITY AND QUANTITY OF MEDICAL EVIDENCE

There is no question that Cabana suffered spinal injuries in her 2006 automobile accident, nor is there any dispute that she would be entitled to LTD benefits under the Plan if those injuries prevent her from "perform[ing] the material duties of any occupation." (AR at 13; Pl. Br. at 21–25; Def. Br. at 18–20.) The Court therefore turns to that single question: do her injuries keep Plaintiff from engaging in any occupation?

#### a. Initial Treatment Records

The first element weighing in Plaintiff's favor is her own conduct, which reveals an aggressive treatment approach, ultimately tempered after several years by resignation.

Cabana responded to her injuries quickly, and pursued vigorous options for years. Within weeks of her accident, she had visited an orthopedist and begun receiving treatment with anti-inflammatories. (AR at 3042.) When those early MRIs revealed substantial injuries, and her physical therapy home exercises proved insufficient, Plaintiff sought out an epidural injection. (Id. at 2379.) She began taking pain medications and saw new doctors. (Id. at 506, 1338, 1563–1564.) This merry-go-round eventually led her to Dr. Mesiwala, who suggested that she try multiple invasive procedures. (Id. at 506–507.)

Cabana agreed, and soon underwent (1) a discogram—which involves sticking a needle into the patient's spine, (2) a discectomy—which involves cutting open a patient's back in order to remove a spinal disc, and (3) a spinal fusion—which leaves spinal vertebrae surgically fused together. (Id. at 500, 645–647.) Because the initial discectomy and fusion dealt with only one part of her spine, Cabana underwent a second set of virtually identical procedures less than six months later. (Id. at 638–641.)

11

Plaintiff was in pain even after these surgeries, but her x-rays came back normal.  (Id. at 712, 717.)  Insistent, she sought out two more epidural injections.  (Id. at 760, 762.)  And since neither of these were of any lasting help, Cabana eventually persuaded Dr. Mesiwala to review a new CT scan; it showed spinal compression and "bony fragments" pressing against her spine.  (Id. at 772, 1080–1081.)

Again Cabana chose surgery.  A year after her first operation, Dr. Mesiwala "scraped" bony growths off of her spine and discovered that the original fusion efforts had failed.  (Id. at 727.)  And again, the pain continued, with Cabana seeking out two more epidural injections in December 2009.  (Id. at 756, 758.)

In short, throughout the three years following her accident, Plaintiff demonstrated a regular pattern of seeking appropriate medical attention.  She eventually shifted her energies from curing the pain to managing it, but altogether the first several years of reports indicate a patient who simply decided that further poking, prodding, discectomies, fusions, and epidurals would be pointless.  She would continue taking her pain medications, but little else.

### b.  Termination of Benefits and Appeal

Defendant continued providing Cabana with LTD benefits even after she shifted to a pain management regime.  It continued providing benefits even after the 24 month change in her LTD benefit standard, acknowledging that she was incapable of "perform[ing] the material duties of *any occupation*."  (AR at 382) (emphasis added.)[3] Defendant only changed its mind after paying benefits under the "any occupation" standard for almost 18 months.  (Id. at 214.)

And what caused the termination?  The short answer is, "something Nurse Walder determined during her late 2011 follow-up with Plaintiff."  Perhaps her unadorned conclusion that Plaintiff had stopped taking one of her painkillers.  (Id. at

---

[3]  This determination was actually made after only 18 months.  However, it was subsequently reaffirmed beyond the 24 month mark.  (AR at 212–213.)

1   214.)  Nevermind that her pharmacy records reflect regular prescription refills both

2   before and after the benefits termination.  (Id. at 3559–3560, 3405–3457.)  Or perhaps it

3   was Nurse Walder's determination that Cabana seemed resistant to trying new treatment

4   options.  (Id. at 214)  Of course, as described above, she had only given up on new

5   treatment options after several years of aggressive attempts to "find a cure."  Neither of

6   these arguments is especially persuasive and, in all, Nurse Walder's conclusory findings

7   are a thin reed upon which to base Defendant's termination of benefits.

8          The administrative appeal process provides Plaintiff with even more support for

9   a finding of total disability.  Dr. Patterson, the rehabilitation specialist, said that her

10  injuries were severe enough to cause poor bladder control and blacking out episodes.

11  (Id. at 898, 900.)  Dr. Disney, the neurologist, said that her disc fusions were not solid

12  and that she had an antalgic gait.  (Id. at 885, 887.)  Mr. Anfuso, a second rehab

13  specialist, performed a series of tests, all indicating that she would be unable to work

14  without substantial distraction caused by her pain.  (Id. at 1333, 1410.)  Cabana's

15  boyfriend, N.P. Hollenbeck, and Cabana herself all submitted statements indicating that

16  she was in so much pain that she could not "do anything or go anywhere."  (Id. at 873,

17  876, 902.)  All of this strongly suggests that Cabana would be completely incapable of

18  spending a full day—or even a small portion of a day—in a work environment.

19         The only evidence Defendant was able to marshal against this finding is a report

20  by Dr. Kounang.  The report itself is a somewhat surprising piece of work, given that

21  Dr. Kounang based it largely on Cabana's prior medical records.  (Id. at 971–980.)  Of

22  course, all of her prior health care workers—including Dr. Mesiwala, who indicated that

23  he might have accidentally caused permanent nerve damage during Plaintiff's third

24  operation—said that she was in severe pain.  But Dr. Kounang came to an entirely

25  different conclusion.

26         He drew upon these several years' worth of reports, compared them to his own

27  brief physical examination—conducted without the assistance of imaging

28  technology—and determined that there were "no objective findings" to substantiate

13

1    Plaintiff's claimed disability.  (Id. at 982.)  But as the Ninth Circuit has indicated on

2    multiple occasions, "[i]t would probably have been unreasonable . . . to require [a

3    plaintiff] to produce objective proof of his pain level."  Montour v. Hartford Life &

4    Accident Ins. Co., 588 F.3d 623, 635 (9th Cir. 2009).  Moreover, while he came to this

5    ultimate conclusion, Dr. Kounang also pointed to at least one fact that cut the other way:

6    Cabana "walks on her toes with hesitation and walks on her heels with back pain"—in

7    other words, she walks with the same "antalgic gait" commented upon by every other

8    person to treat Plaintiff after her accident.  (Id. at 966.)[4]

9         Dr. Kounang also relied upon a "follow-up imaging study," which appeared to

10   show a successful spinal fusion.  (Id. at 1312.)  But as indicated by a number of medical

11   professionals—including the surgeon who performed the fusion—x-rays and CT scans

12   are not necessarily helpful in determining whether spinal fusion has been successful.

13   (Id. at 1088.)

14        **2.  CONSIDERATION OF CONTRARY SSA DISABILITY DETERMINATION**

15        In its last-ditch effort to counter Plaintiff's evidence, Defendant argues that the

16   Court should be guided by SSA's 2010 determination that Cabana was "not disabled."

17   (Def. Br. at 7–8.)  But it is quite plain that SSA did not have even a fraction of the

18   medical record now before the Court.  At the least, much of the record was developed

19   after this determination was made.

20        Moreover, the Ninth Circuit's guidance suggests that consideration of SSA

21   findings may be appropriate—in a limited manner—when conducting an ERISA abuse-

22   of-discretion review.  Montour, 588 F.3d at 630.  But a de novo review, by its very

23   nature, suggests that the finding itself is irrelevant.  If SSA had conducted an

24   independent medical examination, that could be helpful.  If SSA had even written an

25

26   ─────────────
     [4]
27   The Court also notes that, by the time of Dr. Kounang's exam, Plaintiff was again taking a pain
     medication called Norco.  (AR at 965.)  This is the same medication whose disappearance from
     Plaintiff's usual rotation Nurse Walder had apparently found dispositive in terminating benefits.  (Id.
28   at 213, 214.)

1    independent report concerning Plaintiff's condition, that could be helpful.  But the

2    explanation for SSA's denial of benefits is extraordinarily brief.  "Though [Cabana had]

3    discomfort, the evidence shows [she is] still able to move about and to use [her] arms,

4    hands and legs in a satisfactory manner."  (AR at 791–792.)  No description of the

5    evidence supporting this conclusion has been provided, and no definition of

6    "satisfactory manner" was given.  In light of the remainder of the 3,560 page record,

7    SSA's disembodied conclusion is hardly useful.

8        **3. CONCLUSION**

9        The Court does not give any special deference to N.P. Hollenbeck, or any other

10   care provider, simply because they might be deemed a "treating physician."  As

11   Defendant points out, "a treating physician's opinion gets no special weight."  (Def. Br.

12   at 20) (quoting Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869,

13   879 (9th Cir. 2004).)  Nevertheless, the vast weight of the evidence indicates that N.P.

14   Hollenbeck's assessment of Plaintiff's condition is correct:  she can neither sit nor stand

15   for even brief periods of time without great discomfort.  She can hardly be expected to

16   spend a full work day seated at a desk or on her feet if she is unable to sit for the length

17   of a single movie.  (See AR at 873.)  Under these circumstances, the Court must

18   conclude that she "cannot perform the material duties of any occupation" that her

19   "education, training or experience will reasonably allow."  (Id. at 13.)  Plaintiff is,

20   accordingly, "totally disabled" within the meaning of the Plan.

21   ///

22   ///

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.

## CONCLUSION

Based on the reasoning given above, the Court finds in favor of Plaintiff and **ORDERS** her to submit a proposed final judgment consistent with this order by the close of business on **October 10, 2014**.

**IT IS SO ORDERED.**

DATED: September 25, 2014

_____
Judge Gary Allen Feess
United States District Court